[900 NYS2d 273]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWIN SANTIAGO, Appellant.

First Department, May 6, 2010

**APPEARANCES OF COUNSEL**

*Steven Banks, The Legal Aid Society*, New York City (*Jeffrey Dellheim* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Patrick J. Hynes* of counsel), for respondent.

**OPINION OF THE COURT**

BUCKLEY, J.

Based on the identification testimony of the victim and two witnesses, a jury convicted defendant of assault in the first degree for repeatedly slashing a woman with a box cutter in a subway station.

In the early morning hours of January 10, 2003, the victim was standing on a well-lit subway platform with 5 to 10 other people, when she noticed defendant make eye contact with her, step behind a pillar, and reappear closer to her. Defendant repeated the sequence, during the course of which he passed by Pablo Alarcon, who also made eye contact with him. Both the victim and Alarcon took particular note of defendant, due to his strange behavior and multiple layers of clothing, including a red hood, dark jacket, and jeans. Although defendant's face was partially covered by the hood, Alarcon could see that he was an Hispanic of slightly darker complexion than Alarcon himself, had a dark goatee and eyebrows, and appeared to be in his mid-20s; Alarcon considered defendant's facial expression to be suspicious and frightening.

Edwin Rios entered the station and walked past the victim and defendant, who by then were conversing. Rios's attention was first drawn to the victim, an attractive young lady wearing a short skirt, but he also observed defendant's face and clothing.

Defendant, now arm's length distant from the victim, paced in front of her for a few seconds and then asked if she was "working." She did not understand the question, and requested clarification. He asked if she was "an escort." When the victim replied in the negative, defendant began to slash at her head repeatedly with a box cutter, causing her to bleed profusely and severing her thumb. From about 15 feet away, Rios turned to see defendant attacking the victim, who was attempting to defend herself. Hearing screaming, Alarcon also looked to see the assault. Defendant then broke off his attack and ran past Rios, who saw his face again, as well as an orange box cutter in

his hand, and Alarcon, who observed defendant put in his pocket what appeared to be a "construction knife" used "to cut sheet rock." Defendant jumped onto the tracks and escaped down the tunnel, while the victim, calling for help, went up the station stairwell.

The victim was taken to the hospital, where she described her assailant to the police as a tan-skinned Hispanic man, about five feet, eight inches tall, in his late 20s or early 30s, with a mustache that continued down his chin. The next day, she worked with a police artist to create a sketch of the assailant. Two days after that, the police went to the subway station as part of an investigation and spoke with Rios, who described the assailant as a light-skinned Hispanic with a goatee similar to Rios's own, in his late 20s, about five feet, eight inches tall, of medium build, and wearing blue jeans, a dark blue sweater, and a hood. Rios believed that the police sketch accurately portrayed the assailant.

On January 23rd, 13 days after the incident, Alarcon looked at a photo array, but did not recognize anyone. The next day, the victim identified defendant from a photo array. On January 25th, defendant was taken into custody, and the day after that the victim and Alarcon separately viewed a lineup. The victim immediately identified defendant as her attacker. Although Alarcon was "eighty percent" certain that defendant was the assailant, he told the police that he did not recognize anyone, because he harbored trepidations regarding his immigration status. The day after the lineup, Alarcon saw a photograph in a newspaper depicting defendant in handcuffs and accompanied by two police officers. Alarcon showed the photograph to his supervisor, but still did not mention anything to the authorities. In December 2003, 11 months after the attack, an assistant district attorney telephoned Alarcon, who admitted that he had recognized someone in the lineup and in the newspaper. Upon being shown a photograph of the lineup, Alarcon identified defendant.

In January 2004, Rios, who had not previously been shown any photographs, viewed a lineup. Even though defendant had shaved off most of his goatee by then, Rios identified him.

The victim and Rios positively identified defendant in the courtroom, while Alarcon identified him with 80% certainty.

The hearing court properly denied defendant's motion to suppress the identification testimony. The record, including the lineup photographs, establishes that the composition of the lineups was not unduly suggestive (see People v Chipp, 75 NY2d

327, 336 [1990], *cert denied* 498 US 833 [1990]). The differences between defendant and the fillers in facial hair and apparent age were not so distinguishing as to single out defendant (*see id.*; *People v Amuso*, 39 AD3d 425 [2007], *lv denied* 9 NY3d 862 [2007]; *People v Evans*, 202 AD2d 377 [1994], *lv denied* 83 NY2d 966 [1994]). Any disparities in height and weight were minimized by the fact that the lineup participants were viewed while seated and holding large numbered cards in front of their torsos (*see Amuso*, 39 AD3d at 425-426). There is no basis for disturbing the court's credibility findings that Alarcon recognized defendant at the initial lineup but told the police otherwise out of fear concerning his immigration status, and that his identification was not the result of postlineup events (*see People v Garcia*, 284 AD2d 106, 107 [2001], *lv denied* 97 NY2d 641 [2001]). Since defendant himself elicited at trial Alarcon's photographic identification, he cannot be heard to complain now of its introduction (*see People v Cuiman*, 229 AD2d 280, 282 [1997], *lv denied* 90 NY2d 903 [1997]).

The only preserved challenge to the prosecutor's summation concerns a remark to which defendant objected as not supported by testimony; however, we reject that claim. Defendant's remaining objections to the prosecutor's closing statement are unpreserved for review, and we decline to review them in the interest of justice. As an alternative holding, none of the cited comments exceeded the broad latitude accorded on summation (*see People v D'Alessandro*, 184 AD2d 114, 119 [1992], *lv denied* 81 NY2d 884 [1993]).

Defendant's argument regarding the jury charge on unanimity is also unpreserved (*see People v Parra*, 58 AD3d 479 [2009], *lv denied* 12 NY3d 820 [2009]), and we decline to review it in the interest of justice. As an alternative holding, we find that the charge, as a whole, conveyed the proper legal principles (*see People v Drake*, 7 NY3d 28, 34 [2006]), and a jury poll confirmed that the verdict was, in fact, unanimous.

The verdict was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 348-349 [2007]). The sentence was not excessive, and we decline to reduce it in the interest of justice.

The remaining issue is whether the court should have allowed defendant to present expert testimony regarding identifications or ordered a *Frye* hearing on the matter. Initially, defendant's assertion that the trial court was bound by the law of the case doctrine to conduct a *Frye* hearing is belied by the plain

language of the earlier Justice's preliminary ruling on the matter.

Defendant's motion to permit expert testimony set forth three groups of factors purportedly affecting the accuracy of witness identification: (1) event factors (exposure time to an event and cross-racial accuracy); (2) investigative factors (similarity of lineup participants, lineup instructions, rate of memory loss, influence of information acquired after the event, wording of questions to witnesses, unconscious transference to the crime scene of a person from elsewhere, preexisting attitudes and expectations of witnesses, and simultaneous versus sequential lineups); and (3) witness confidence (correlation of confidence level with accuracy and weapon focus). The trial court determined that, under the circumstances of this case, the proposed topics were either inapplicable, within the common understanding of the jury, or not warranted.

In *People v LeGrand* (8 NY3d 449, 452 [2007]) the Court of Appeals stated that, although the decision whether to admit expert testimony regarding eyewitness identification ordinarily rests within the trial court's discretion,

> "where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror."

The Court of Appeals has recognized that expert testimony is "a kind of authorized encroachment" into the jury's otherwise exclusive province of drawing conclusions from the facts (*People v Lee*, 96 NY2d 157, 162 [2001] [internal quotation marks omitted]). Even where a qualified expert's testimony might be relevant, beyond the ken of the average juror, and based on principles generally accepted in the scientific community, a court can providently exclude such testimony if it would unnecessarily distract the jury (*see People v Young*, 7 NY3d 40, 46 [2006]). With those considerations in mind, "[t]he trial court should weigh defendant's request to admit expert testimony against factors 'such as the centrality of the identification issue and the

existence of corroborating evidence' " (*LeGrand*, 8 NY3d at 456, quoting *Lee*, 96 NY2d at 163). The qualifying "such as" language indicates that there may be other factors, but the overriding concern is the degree of risk of misidentification (*see People v Marte*, 12 NY3d 583, 589 [2009], *cert denied* 559 US —, 130 S Ct 1501 [2010]). The Court in *LeGrand* did not hold that expert testimony must be allowed if there is no corroborating evidence; rather, the Court stated that it is an abuse of discretion to preclude expert testimony where "the case turns on the accuracy of eyewitness identifications *and* there is little or no corroborating evidence connecting the defendant to the crime" (8 NY3d at 452 [emphasis added]). Thus, the issue of whether expert testimony must be allowed depends on the risk of convicting the wrong person (*see e.g. Young*, 7 NY3d at 46 ["(i)t was reasonable, under the circumstances, for the trial court to conclude that (the victim's) identification was quite unlikely to be mistaken"]). Where the accuracy of an identification is more in doubt, the risk of wrongful conviction is greater, thereby militating in favor of admitting expert testimony. Indeed, in spite of some expansive language in *LeGrand*, the Court of Appeals' holding in that case, and in *Young* and *Lee*, was expressly based on the "facts and circumstances" particular to each case (*LeGrand*, 8 NY3d at 456, 459; *see Young*, 7 NY3d at 46; *Lee*, 96 NY2d at 163).

In *LeGrand*, there was no forensic or other physical evidence linking the defendant to the fatal stabbing, and the People's case rested only on shaky identifications of eyewitnesses made almost seven years after the commission of the crime (8 NY3d at 453). One of the witnesses identified the defendant in a photo array and a lineup; a second witness thought the defendant's photo was a " 'close, if not exact' " match; a third witness characterized the defendant's photo as " 'similar' " to that of the assailant; and the remaining two witnesses were unable to identify the defendant (*id.*). Three years after those identifications, 10 years after the crime, the defendant was identified at trial by three of the witnesses, two of whom viewed a photo array the day before their testimony (*id.*). The jury could not reach a verdict, and prior to his new trial, defendant moved to introduce expert testimony on the reliability of eyewitness identification (*id.*). The trial court found several aspects of the proposed testimony to be relevant and beyond the ken of the average juror, but, following a *Frye* hearing, precluded the evidence on the ground that it was not generally accepted in the

scientific community (*id.* at 453-454). The Court of Appeals, however, determined that three factors that influence the reliability of eyewitness identifications are generally accepted: correlation between confidence and accuracy of identification, the effect of postevent information on the accuracy of identification, and confidence malleability (*id.* at 458).

The Court of Appeals in *Young* opined that if there had not been corroborating evidence (stolen property found in the possession of two of the defendant's acquaintances), "it might well have been an abuse of discretion" to deny expert testimony on issues such as cross-racial identification, weapon focus, the effect of stress on recollection, and the correlation between confidence and accuracy (7 NY3d at 45). In that case, one victim was unable to identify the defendant (*id.* at 42). The other victim saw only part of the robber's face, retained a clear recollection of only his eyes, and viewed him under conditions of high stress while he held an axe over her wheelchair-bound husband's head (*id.* at 42, 45). That second victim also failed to recognize the defendant's picture in a photo array, although she did pick him out of a viewing and listening lineup (*id.* at 42).

In *Lee*, the Court of Appeals ruled that it was a provident exercise of discretion to preclude expert evidence, where the trial court heard testimony regarding the circumstances under which the robbery victim observed the defendant and there was corroborating evidence, namely that the defendant was arrested while driving the stolen car (96 NY2d at 163).

Most recently, the Court of Appeals revisited the issue in the simultaneously decided *People v Abney* and *People v Allen* (13 NY3d 251 [2009]). The Court held that it was an abuse of discretion to deny expert testimony in *Abney*, but not in *Allen* (*id.* at 268).

In *Abney*, the 13-year-old complainant was robbed at knifepoint during an encounter that "was fleeting" (*id.* at 257). About one hour later, the victim reported the incident to the police, describing her assailant as a black man with " 'pinkish' " lips, in his 30s, over six feet tall, and wearing a short-sleeved blue shirt and blue bandana (*id.* at 257). The complainant identified the defendant from a photo array that day and picked him out of a lineup three weeks later (*id.* at 257-258). The trial court denied the defendant's request to present expert testimony on 15 factors relating to the reliability of witness identification (*id.* at 259). A three-Justice majority of this Court affirmed, on the ground that the defendant's witnesses' alibi testimony

evinced a consciousness of guilt, which constituted corroborative evidence (*see* 57 AD3d 35, 43-46 [2008]). Specifically, there was testimony indicating that the defendant had sought to document an alibi before he was arrested (*see id.*). The two-Justice dissent noted the significant testimony that supported the defendant's alibi and that called into question whether he tried to establish that alibi prior to his arrest (*see id.* at 52-53). The Court of Appeals ruled that the trial court had abused its discretion in precluding expert testimony on the subject of witness confidence and in failing to conduct a *Frye* hearing on the proposed testimony regarding the effects of event stress, exposure time, event violence and weapon focus, and cross-racial identification (13 NY3d at 268).* The Court determined that "[w]hile defendant's muddled alibi evidence was no doubt unhelpful to his cause with the jury, it is not overwhelmingly inculpatory either," and thus was not sufficiently corroborative (*id.*). However, the Court did not state that the lack of corroborative evidence settled the question of whether expert testimony had to be allowed. Rather, the Court based its decision on the fact that "there was no evidence other than [the victim's] identification to connect defendant to the crime, *and she did not describe him as possessing any unusual or distinctive features or physical characteristics*" (*id.* [emphasis added]). As the highlighted conjunctive phrase indicates, a single witness's testimony, by itself, may be enough to render a motion for expert testimony a matter of the trial court's discretion.

In *Allen*, the companion case to *Abney*, two masked men, one displaying a knife, the other a gun, held up a barbershop (*id.* at 262). Although the knife-wielder's mask covered all of his face except the portion from his top lip to above the eyebrows, one of the customers, Gabriel Bierd, recognized him from the neighborhood, based on his voice and body type (*id.*). Bierd selected the defendant's photo from an array and identified him in a lineup, as did one the robbed barbers, Juan Almonte (*id.* at 262-263). The Court of Appeals held that the trial court had not abused its discretion in denying expert testimony, since

> "the case did not depend exclusively on Bierd's eyewitness testimony—i.e., *Allen* is not a 'case [that] turns on the accuracy of eyewitness identifications

---

* The Court of Appeals found the subjects of lineup instructions and double-blind lineups were not relevant to the particular circumstances of the case (*id.*).

[where] there is little or no corroborating evidence connecting the defendant to the crime' (*LeGrand*, 8 NY3d at 452). *Critically, Almonte independently identified defendant* as the knife-wielding robber who searched him and stood nearby throughout the course of the robbery. And defendant was not a stranger to either Bierd or Almonte" (*id.* at 269 [emphasis added]).

Thus, where corroborating evidence might be required, it need not be forensic or physical, but can be established by additional eyewitness testimony. That is the precise position that the dissenter herein embraced in her dissent in *Abney*:

"Obviously, this does not mean that in every case turning on eyewitness identification testimony, a court must admit expert testimony bearing on the reliability of the identification . . . [and] the particular circumstances of a case will often render expertise about the accuracy of an identification of little or no utility[,] . . . for example, a case in which the identifying witness previously knew the perpetrator, *or in which the opportunity to observe was ample*, or in which extreme stress or cross-racial factors could have played no role affecting the reliability of the identification, or in which the witness was not distracted from her observation of the perpetrator by the near and undoubtedly terrifying presence of a threatening weapon, or in which there was no question as to whether police conduct and procedures affected the witness's post-incident identification" (57 AD3d at 50-51 [emphasis added]).

As discussed more fully infra, the instant case is one "in which the opportunity to observe was ample."

This Court has repeatedly distinguished *LeGrand* from instances where there was reliable witness identification testimony (*see People v Smith*, 57 AD3d 356 [2008], *lv denied* 12 NY3d 821 [2009]; *People v Chisolm*, 57 AD3d 223 [2008], *lv denied* 12 NY3d 782 [2009]; *People v Austin*, 46 AD3d 195 [2007], *lv denied* 9 NY3d 1031 [2008]; *see also People v Keitt*, 60 AD3d 501 [2009], *lv denied* 12 NY3d 917 [2009]).

In *Smith* and *Chisolm*, there was corroborative evidence, but this Court nevertheless stressed the reliability of the identifications, in contrast to *LeGrand*. Specifically, in *Smith*, this Court

noted the "highly reliable multiple eyewitness identifications," each of whom "observed the perpetrator at close range on a well-lit street" and identified the defendant in a lineup shortly after the shooting; one of those witnesses also recognized the defendant from the neighborhood (57 AD3d at 357). Similarly, in *Chisolm*, the victim's husband saw the perpetrator in broad daylight with his wife's wallet moments after it was stolen, further observed the perpetrator's features during a two-block chase, provided a detailed description shortly after the incident, and identified the defendant from a videotape and in a lineup a few weeks later (57 AD3d at 224). Both *Smith* and *Chisolm* remarked on the contrasting facts of *LeGrand*, where the reliability of the defendant's identification was seriously in doubt, in that only one of the multiple witnesses was able to identify the defendant in a lineup and photo array, seven years after the crime (*see Smith*, 57 AD3d at 357; *Chisolm*, 57 AD3d at 224).

In *Austin*, as here, there was no corroborating evidence, yet this Court found the trial court's exclusion of expert testimony was a provident exercise of discretion, since the complainant had ample opportunity to observe his assailant in a well-lit area, at close range, and chased him for two blocks, after which he gave the police a relatively detailed description, and five days later spotted the defendant on the street and pointed him out to the police (46 AD3d at 200).

The Second Department is in accord. In *People v Tocci* (52 AD3d 541, 542 [2008], *lv denied* 11 NY3d 858 [2008]), the Court ruled that the defense request to present expert testimony had been properly denied, "since there were 11 eyewitnesses as well as additional significant corroborating evidence, and there was no indication that the jury required such testimony." *People v Gonzalez* (47 AD3d 831 [2008], *lv denied* 10 NY3d 863 [2008]) is not to the contrary. There, the Second Department held that, under the particular circumstances, it was error to deny expert testimony on the reliability of identification (*id.* at 833). The victim had described her assailant as dark-skinned, well-built, and weighing about 150 pounds, but the defendant weighed more than 200 pounds, was tan-skinned, and had an unmentioned "distinctive goatee and a tattoo covering his right forearm" (*id.* at 832). The discrepancy between the description and the defendant's actual appearance thus cast serious doubt on the accuracy of the identification.

Applying the precedents to the case at hand, we find that the trial court did not abuse its discretion in denying defendant's

motion to present expert testimony. The victim plus two other witnesses independently described and identified defendant. All three witnesses had ample opportunity to observe defendant at close quarters, in a well-lit setting. All three witnesses noticed defendant before there was any criminality; two of the witnesses took particular cognizance of defendant due to his peculiar behavior, and the third because he appeared to be associated with an attractive woman. The two eyewitnesses, Alarcon and Rios, also observed defendant during the assault and his escape from the station. Immediately after the incident, the victim described her attacker to the police and helped prepare a sketch. Two weeks later, the victim identified defendant in a photo array and lineup, while Alarcon recognized defendant in a lineup and a newspaper photograph. Although Rios did not view a lineup until one year later, he had described defendant and confirmed the accuracy of the sketch three days after the incident; moreover, he picked defendant out of the lineup notwithstanding the fact that defendant had altered his appearance by shaving most of his facial hair.

Under those circumstances, it was reasonable for the trial court to conclude that the identification by multiple, corroborative witnesses " 'was quite unlikely to be mistaken, and that [the expert's] testimony would be an unnecessary distraction for the jury' " (*Abney*, 13 NY3d at 267, quoting *Young*, 7 NY3d at 46). This case thus stands in marked contrast to *LeGrand* (8 NY3d at 453), where essentially only one out of five witnesses could positively identify defendant seven years after the crime, and *Abney* (13 NY3d at 257, 268), where one witness, who had merely a "fleeting" encounter, provided a minimal description.

To the extent the reliability of the witness identifications in *Young* was called into question, it is also distinguishable, since in that case one witness could not identify the robber, and the other had a dubious opportunity to adequately view him and failed to recognize his photo in an array (7 NY3d at 42, 45).

Accordingly, the judgment of the Supreme Court, New York County (Edward J. McLaughlin, J.), rendered April 28, 2004, convicting defendant, after a jury trial, of assault in the first degree, and sentencing him, as a second felony offender, to a prison term of 25 years, should be affirmed.

McGUIRE, J. (concurring). I agree that reversal is not required under the rule of *People v LeGrand* (8 NY3d 449 [2007]), but disagree with the analyses of Justices Buckley and Moskowitz.

The rule of *LeGrand*, of course, is that

> "where [a] case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror" (*id.* at 452).

This case certainly turns on the accuracy of eyewitness identification testimony, and the expert's testimony satisfies, at least with respect to the subject of witness confidence and accuracy, each of the above four factors.[1] Is this case, however, one in which there is "little or no corroborating evidence connecting the defendant to the crime"? If it is, can the erroneous exclusion of the expert's testimony be considered harmless error? In my view, we need not answer the first question; but assuming the answer is yes, the answer to the second question is yes.

In the context of this case, the first question reduces to the following: if the evidence at trial is that more than one eyewitness identified the defendant, can the identifications cross-corroborate each other so that the case is not one in which there is but "little or no corroborating evidence connecting the defendant to the crime?" The recent decision of the Court of Appeals in *People v Abney* (13 NY3d 251 [2009]), suggests that the answer is yes.[2] In *People v Allen*, the other case decided with *People v Abney*, two eyewitnesses, Almonte and Bierd, identified the defendant at lineups held four months after the crime and at trial (*id.* at 262-263). The Court ruled that the case "did not depend exclusively on Bierd's eyewitness testimony—i.e., [it] is

---

**1.** With respect to the other proposed subject of the expert's testimony that is disputed on appeal—the so-called "forgetting curve"—I agree with the People's position that (1) it is common knowledge that memory generally becomes less reliable over time, and (2) while the specific principle that memory loss is greatest immediately after an event may be beyond the ken of the average juror, that principle was not supported by any specific studies identified in defendant's proffer (*see People v Carrieri*, 49 AD3d 660 [2d Dept 2008], *lv denied* 11 NY3d 786 [2008])

**2.** A recent article explores significant issues arising from *LeGrand* and *Abney* (*see* Paul Shechtman, *In the Area of Eyewitness Identification Expert Testimony, LeGrand Should Be Revisited*, 8 NY Crim L Newsl [No. 2] 8 [NY St Bar Assn, Spring 2010]).

not a case [that] turns on the accuracy of eyewitness identifications [where] there is little or no corroborating evidence connecting the defendant to the crime" (*id.* at 269 [internal quotation marks omitted; brackets in original]). A unanimous Court explained: "Critically, Almonte independently identified defendant as the knife-wielding robber who searched him and stood nearby throughout the course of the robbery. And defendant was not a stranger to either Bierd or Almonte" (*id.*).

As is evident, two considerations informed the Court's conclusion: the "independent[ ]" identification by Almonte, and that defendant was known to both identifying witnesses. Although the second consideration might be thought to provide more powerful support (If a defendant is known to the identifying witness or witnesses, can such a case be one that turns on the accuracy rather than the honesty of eyewitness identification testimony?), the Court stated that the first consideration was "[c]ritical[ ]" to its conclusion. Regardless of the relative importance of the two considerations, at the very least the opinion suggests that multiple corporeal identifications that are "independent[ ]" can cross-corroborate each other so that the case is not one in which there is but "little or no corroborating evidence connecting the defendant to the crime."[3]

The dissent is unpersuasive in concluding otherwise, although I need not decide whether the dissent is wrong. In the first place, the analysis is not "quite simple," because it is not at all clear how much and what forms of corroboration are sufficient to provide more than "little . . . corroborating evidence connecting the defendant to the crime" (*LeGrand*, 8 NY3d at 452). Of course, the dissent is correct that "the problem of misidentification can exist whether there is one eyewitness or several."

---

**3.** Circumstances can be conceived in which it would be particularly difficult to defend the conclusion that multiple corporeal identifications never can cross-corroborate each other for purposes of the *LeGrand* rule. Suppose, for example, three eyewitnesses, each of whom had extended opportunities to observe the perpetrator under nonstressful circumstances, separately gave accurate and detailed descriptions and identified him at separate lineups shortly after the crime and at trial. Of course, the proposed expert testimony might undercut the force of the identification testimony of each identifying witness. According to the People, however, even the defense expert who testified at the *Frye* hearing in *LeGrand* conceded that the risk of a false identification can be "substantially reduced if two or more witnesses are available" (People's Brief in *People v LeGrand* at 102). On the other hand, the conclusion that multiple corporeal identifications never can cross-corroborate each other would be easier to defend if harmless error analysis is applicable to a violation of the *LeGrand* rule. After all, these hypothetical circumstances also would support a harmless error argument.

But the question is whether all cases of multiple identifications, regardless of their particular facts, must be treated the same for the purpose of the *LeGrand* rule. Contrary to the dissent, the opinion in *LeGrand* does not purport to address the question. True, the opinion notes that three witnesses identified the defendant during the first trial (8 NY3d at 453). But the Court immediately went on to note that "two of the witnesses had seen defendant's photo array in the district attorney's office the night before they were to testify" (*id.*). Thus, the Court may not have regarded these corporeal identifications as "independent[ ]." It seems unlikely, moreover, that the Court intended in *LeGrand* to decide without discussion the important question of whether multiple corporeal identifications can provide the corroboration connecting the defendant to the crime that can justify a trial court's decision to exclude the testimony of a defense expert. Finally, the dissent fails to deal with or even mention the statement in *Abney* (*Allen*), quoted above, that a "[c]ritical[ ]" factor supporting the Court's conclusion that the exclusion of the expert testimony did not violate the *LeGrand* rule was that "Almonte independently identified defendant as the knife-wielding robber." Rather than regard the statement as gratuitous for some reason, I would take the Court at its word.

Justice Buckley is unpersuasive to the extent his position is that under *LeGrand* the testimony of a defense expert properly can be excluded "where there [is] *reliable* witness identification testimony" (emphasis added). Nothing in *LeGrand* or *Abney* (*Allen*) (nor, for that matter, in *People v Lee* [96 NY2d 157 (2001)] or *People v Young* [7 NY3d 40 (2006)]) supports the proposition that trial courts properly can exclude expert testimony offered by the defense when the identification testimony from the prosecution can be regarded as "reliable." Nor do the decisions of this Court cited by Justice Buckley so hold. In *People v Smith* (57 AD3d 356 [2008], *lv denied* 12 NY3d 821 [2009]), the panel noted the "highly reliable multiple eyewitness identifications" (*id.* at 357), but did not rest its holding on that ground. Rather, the holding was that "the exclusion of expert testimony on the reliability of eyewitness identification" did not require reversal "[s]ince there was sufficient corroboration of defendant's guilt, including consciousness-of-guilt evidence and partially incriminating statements to the police" (*id.*). Similarly, *People v Chisolm* (57 AD3d 223 [2008], *lv denied* 12 NY3d 782 [2009]) upheld the exclusion of expert testimony

on eyewitness identification because "[t]here was significant corroborating evidence of defendant's guilt" (*id.* at 223-224 [citation omitted]). In *People v Austin* (46 AD3d 195 [2007], *lv denied* 9 NY3d 1031 [2008]), the panel relied on preservation grounds when it ruled that the defendant had "failed to establish at any point [at trial] the relevance of the proffered testimony to the particular facts of this case" (*id.* at 199). Accordingly, the subsequent discussion (*id.* at 200-201), contrasting the factual circumstances of the identification with those in *LeGrand*, appears to be dicta.

We should not try to read the tea leaves in *LeGrand* and *Abney* and determine whether multiple identifications can cross-corroborate each other so as to provide more than a "little . . . corroborating evidence connecting the defendant to the crime." Regardless of how the Court of Appeals may rule on that question, I think it clear the erroneous exclusion of expert testimony under *LeGrand* is subject to harmless error analysis and that any error in this case was harmless.[4]

---

4. Deciding this case on harmless error grounds obviates the need to wrestle with constitutional questions raised by *Holmes v South Carolina* (547 US 319 [2006]). There, the question was "whether a criminal defendant's federal constitutional rights are violated by an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict" (*id.* at 321). The Court unanimously ruled that the evidence rule was unconstitutional, explaining that "[t]he point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt" (*id.* at 331). *LeGrand*, of course, does not hold that the testimony of a defense expert is inadmissable where the prosecution's evidence can be regarded as strong (i.e., supported by more than a "little . . . corroborating evidence connecting the defendant to the crime"). But *LeGrand* does hold that if the identification testimony adduced by the prosecution is sufficiently corroborated, a trial court does not abuse its discretion when it excludes the testimony of the defense expert. Whether that holding is consistent with *Holmes v South Carolina* is unclear. Nor is it clear whether a rule that permits the exclusion of the testimony of a defense expert when the prosecution has presented proof of multiple and independent identifications (or when the identification testimony presented by the prosecution is considered sufficiently reliable) would pass muster under *Holmes v South Carolina*. One significant question, however, comes into focus when it is considered that under *LeGrand* criminal defendants are entitled to an opportunity to persuade the jury of a reasonable doubt through the testimony of an expert when there is "little or no corroborating evidence" connecting them to the crime. Can a defendant be deprived of that opportunity whenever the prosecution's evidence is marginally stronger, when there is some incremental evidence so that there is more than a "little" corroborating evidence?

At first blush it may seem odd to think that harmless error analysis has any role to play when a trial court abuses its discretion by excluding expert testimony offered by the defense in a case where there is "little or no corroborating evidence connecting the defendant to the crime." If there is "little or no corroborating evidence," how can the error be harmless? But cases can readily be conceived (including ones like *Abney* [*Allen*] in which the defendant is known by the identifying witness or witnesses and those noted earlier in which there are corporeal identifications by multiple witnesses each of whom had extended opportunities to view the perpetrator) in which it would be incomprehensible not to permit harmless error analysis to play a role. Moreover, *Abney* all but states that harmless error analysis does apply (13 NY3d at 268 ["we do not consider the trial judge's error in *Abney* to have been harmless"]). In addition, the Legislature has commanded appellate courts in peremptory terms to determine appeals "without regard to technical errors or defects which do not affect the substantial rights of the parties" (CPL 470.05 [1]). On this score, I also note that this certainly is not a case in which the Federal Constitution precludes harmless error analysis (*see generally United States v Gonzalez-Lopez*, 548 US 140, 148-151 [2006] [discussing "structural defects," a class of constitutional error that, as opposed to "trial error," is not susceptible to harmless error analysis]).

In the first place, the victim provided the jury with a compelling basis for concluding that the People had proven defendant's identity as the attacker beyond a reasonable doubt. This is not a case in which the identifying witness had but a fleeting opportunity to view an attacker under stressful circumstances. To the contrary, the victim first saw the man who would attack her when he was at the opposite end of the platform. As the People argue, despite the distance and the want of any particular reason to pay attention to him, the victim observed the man well enough to recognize him when, shortly thereafter, she saw him again from a closer distance. On that second occasion, she took note of the man's layered clothing and unusual behavior of making eye contact and then stepping behind pillars. She then had an extended opportunity to observe her attacker in good lighting before he assaulted her. That is, after he approached her, she looked at him from about an arm's length distance for several seconds while waiting for him to speak. When he asked her if she was "working," the two were face-to-face; the ensu-

ing conversation lasted for about 30 seconds, until she was attacked. Although her attacker had a garment covering his mouth and chin, the victim could see the man's face from his moustache to above his eyebrows. Moreover, as the People correctly maintain, in describing her attacker to the police, the victim consistently provided details that closely matched defendant's ethnicity, complexion, age and facial hair. Thereafter, she viewed thousands of photographs, and never identified anyone until she saw, only about two weeks after the attack, a recent photograph of defendant in an array of photographs of Hispanic men with moustaches. When she saw the photograph of defendant, her "heart stopped," the same reaction she had just two days later when she identified defendant at a lineup.

As is clear from Justice Buckley's writing, there was much more evidence of defendant's identity as the attacker. With respect to Alarcon, suffice it to say that when he first saw the attacker, as the man walked past him toward the victim, the attacker had not yet covered his mouth and goatee. Alarcon saw him again shortly thereafter, when he heard the victim's screams and saw the attack. Of course, Alarcon testified that he was only 80% sure of his identifications of defendant (the undeclared identification at the lineup and the in-court identification). But his testimony corroborated the victim's identification nonetheless, and that same testimony gave the jury a sound reason for concluding that Alarcon was an honest and careful witness. Finally, Rios also got good looks at the attacker's face, before and after the attack, and also gave a description of the attacker that fit defendant with respect to ethnicity, complexion, age and facial hair. Like the victim, Rios was certain of his identification of defendant as the attacker.

Regardless of whether the constitutional standard of harmless error might apply in another case, the nonconstitutional standard applies here because defendant never alerted the trial court to any claim of constitutional error with respect to the expert's testimony (*People v Kello*, 96 NY2d 740, 743-744 [2001]).

For all these reasons, and for those cited by Justice Buckley in support of his position that "it was reasonable for the trial court to conclude that the identification by multiple, corroborative witnesses 'was quite unlikely to be mistaken,'" I conclude both that the evidence of guilt was overwhelming and that there is no significant probability that the jury would have acquitted if the expert's testimony had not been excluded (*Kello*, 96 NY2d

at 744). Moreover, in its final charge to the jury, the court admonished the jurors to "[k]eep in mind that the witness's confidence or lack of confidence in his or her testimony is not necessarily indicative of accuracy of identification." That authoritative instruction provided defendant with at least some of the benefit of the expert's testimony and further attenuates the possibility that the verdict might have been different if the expert's testimony had not been excluded.

The dissent apparently agrees that harmless error analysis is applicable and that the appropriate standard in this case is the nonconstitutional standard. Oddly, however, the dissent nonetheless relies, inter alia, on the fact that no property of the victim was found with defendant when he was arrested[5] and that none of the witnesses had "ever seen him before." Of course, however, if property of the victim had been found with defendant or if one of the identifying witnesses knew defendant independently of the crime, there would be ample corroborating evidence connecting defendant to the crime and thus no Le-Grand error.

The dissent is wrong in asserting that "[n]one of the witnesses had an extended opportunity to view the assailant." The victim had such an opportunity—under good lighting conditions—and it included a 30-second period of conversation before the attack began, with the assailant standing right in front of the victim. True, the other two identifying witnesses did not observe the attacker for as extended a period. But they, too, observed the attacker under good lighting conditions and saw him both before (i.e., under nonstressful circumstances) and after the attack. Although the opinion in Abney states only that the entire encounter between the victim and the assailant was "fleeting" (13 NY3d at 257), the dissent nonetheless states that the 30-second, pre-attack conversation the victim in this case had with her attacker "appears not to be much longer." In any event regardless of our disagreement about whether the pre-attack encounter provided the victim with an "extended" opportunity to view her attacker, the encounter certainly was not one in which the victim caught only a fleeting glimpse of him. The ability of the victim to provide so many descriptive details of her attacker also stands as persuasive proof of the reliability of her identification (see People v Huertas, 75 NY2d 487, 492

---

5. As the attacker did not steal anything from the victim, it hardly is surprising that defendant was not in possession of any of the victim's property when he was arrested.

[1990] [description given by identifying witness "was probative of her ability to observe and remember her assailant, and thus relevant to the accuracy of the identification she made"]).

The dissent does not come to grips with these facts. Nor does it come to grips with the accuracy of the descriptions given by the victim and Rios, the fact that the lineup occurred just two weeks after the attack or the caution about witness confidence given by the court in its final charge to the jury. Indeed, even though it does not mention that the victim recognized defendant as her attacker at a lineup just two weeks after the attack, the dissent relies on the ostensible fact that Alarcon did not "identif[y] defendant as the assailant until nearly a year after the crime occurred." But Alarcon did see and recognize defendant at the same lineup; all that the dissent fairly can say is that he did not declare his identification until considerably later. Above all, however, the dissent fails to come to grips with the fact that the identifications of each of the three identifying witnesses cross-corroborated each other.[6]

MOSKOWITZ, J. (dissenting). In *People v LeGrand* (8 NY3d 449, 452 [2007]), the Court of Appeals ruled that

> "where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror."

It is indisputable that this case turns on the accuracy of eyewitness identifications. Indeed, as the trial court noted, it is the only issue. It is also indisputable that there was no evidence other than the testimony of these eyewitnesses to connect defendant to the crime. What is disputed is whether the multiple eyewitness identifications in this case can serve as corroborat-

---

**6.** I repeatedly make clear that I do not and need not decide the question of whether multiple corporeal identifications can cross-corroborate each other so that the exclusion of a defense expert's testimony is not error under *LeGrand*. Moreover, I also make clear that I believe there are good reasons not to decide the question. Nonetheless, the dissent apparently believes that I have decided that question.

ing evidence. The plurality believes that the eyewitnesses can corroborate each other, thereby rendering an expert unnecessary under *LeGrand*. Because, under the facts of this case, misidentification remains a risk, the court's refusal to permit any expert testimony constituted an abuse of discretion under *LeGrand*, and, more recently, *People v Abney* (13 NY3d 251 [2009]). Therefore, I must dissent.

The crime occurred on January 10, 2003 sometime before 5:30 A.M. at the Brooklyn Bridge subway station on the northbound J subway platform. The victim and her assailant were strangers. The assailant approached the victim, a 21-year-old female student. He had a brief conversation with her, then took out a box cutter and proceeded to slash her on the right side of her head and her left hand. The victim provided police with a description of her assailant immediately after the attack. Following a police investigation, the victim identified defendant in a photo array on January 24, 2003 and in a lineup on January 26, 2003.

There were two other eyewitnesses to this crime. Pablo Alarcon was on the J train platform on his way to work and made eye contact with the assailant who walked by with his face partly covered. Although a hood partially covered the assailant's face, Alarcon took note because the assailant had a "suspicious" expression that made Alarcon feel afraid. A short time later, Alarcon heard a woman scream and turned to the right to see the assailant attacking a woman who was trying to defend herself. The assailant walked away from the attack, passing Alarcon, who saw him put away a type of knife into his pocket. The assailant escaped into the subway tunnel.

Despite his relatively close look at the perpetrator, Alarcon did not pick defendant out of a photo array. Nor did Alarcon inform the police that he recognized defendant in the January 26 lineup, even though he was "eighty percent" certain that he did. Alarcon initially lied to police, he said, because his immigration status made him afraid. Alarcon subsequently recognized a picture of defendant in the newspaper as the perpetrator. It was not until December 2003, 11 months later, that Alarcon admitted to the District Attorney's office that he had actually recognized defendant in the lineup, but had lied to police. He was subsequently shown a photograph of the January 26, 2003 lineup. At that point he identified defendant, with 80% certainty, as the man he had recognized earlier, but had chosen not to identify. At the suppression hearing, Alarcon also identified defendant as the perpetrator.

Another eyewitness, a man named Edwin Rios, was descending the stairs on the subway platform. He walked past the victim and the assailant while they were conversing. He could see the assailant's entire face and noted that he had a dark goatee and wore a cap, jeans and a hood. Rios also saw the assailant's face again as the assailant ran away from the attack. On January 13, 2003, Rios confirmed to police the accuracy of the sketch a police artist had prepared with assistance from the victim. However, it was not until January 20, 2004, a few days prior to the commencement of trial, that Rios identified defendant at another lineup. At trial, Rios identified defendant as the attacker.

Prior to the trial, defendant sought to introduce expert testimony from Professor Steven Penrod[1] on 12 subjects related to the accuracy of witness identifications. Specifically, defendant asked to elicit Penrod's expert opinion about: (1) exposure time; (2) cross-racial identification accuracy; (3) similarity of lineup fillers increasing the accuracy of identification; (4) how lineup instructions can affect the eyewitness's willingness to make an identification; (5) rate of memory loss; (6) influence of information acquired after the event; (7) wording of witness questioning; (8) unconscious transference to crime scene of person seen elsewhere; (9) preexisting witness attitudes and expectations; (10) simultaneous versus sequential lineups; (11) weapon focus; and (12) factors influencing witness confidence. In opposition, the People argued that the proffered testimony should be excluded as irrelevant, within the average juror's ken and not generally accepted within the scientific community. Alternatively, the People sought a *Frye* hearing to determine whether Professor Penrod's testimony would be based on professionally reliable sources.

In a written decision dated September 23, 2003, the motion court (Budd Goodman, J.) ordered a *Frye* hearing, to be conducted by the trial court, on the issue of whether defendant's proffered expert testimony was based on principles generally accepted in the scientific community and would be relevant to the case. Justice Goodman wrote that the trial court was "best positioned to determine whether the expert's testimony is 'generally accepted' and whether the proffered testimony is relevant and not unduly prejudicial." In a subsequent hearing conducted on December 9, 2003, Justice Goodman reiterated

---

1. The People do not contest Dr. Penrod's qualifications.

that it was for the trial judge to decide which, if any, of the 12 proposed subjects for expert testimony were appropriate.

However, on December 19, 2003, the trial court (McLaughlin, J.) denied both defendant's request for expert witness testimony and a *Frye* hearing. Citing *People v Lee* (96 NY2d 157 [2001]), Justice McLaughlin held that "this is not an appropriate case for an expert witness on any aspect of identification testimony. Consequently, the court will not conduct a *Frye* hearing as previously ordered" (2 Misc 3d 652, 653 [2003]). He reasoned that expert testimony concerning accuracy of identification was unnecessary because the victim had ample opportunity to observe her attacker, provided a description immediately after the attack, helped a police artist render a composite sketch one day later, selected defendant's photograph from an array two weeks thereafter, and, on the next day, identified defendant in a lineup (*id.*).[2]

More specifically, Justice McLaughlin ruled that the proposed topic of weapon focus was not relevant because the victim never saw a weapon (*id.* at 654), that expert testimony as to how police investigative procedures might affect a lineup would be inappropriate as the victim would naturally assume that the person she had identified in the photo array would appear in the following day's lineup (*id.*) and that the composite sketch prepared the day after the assault memorialized the victim's recollection of her attacker, negating the potential significance of postevent information, the "forgetting curve," the wording of questions and confidence malleability (*id.*). Justice McLaughlin also ruled that there were no generally accepted scientific principles concerning postevent information and unconscious transference (*id.* at 655), that issues concerning sequential lineups are not appropriate for jury resolution, that defendant and the victim are not members of different races as contemplated in the research literature and that the issue of the victim's confidence vis-à-vis her identification could be sufficiently addressed in voir dire and the jury charge (*id.*).

At trial, after resting his case and the denial of his motion to dismiss the indictment, defendant renewed his motion to admit expert testimony on identification. The court denied that request also.

---

**2.** In his ruling, Justice McLaughlin made factual findings only with regard to the victim's identification, because, at this point pre-trial, neither Rios nor Alarcon had yet identified defendant.

Notably, at the time he made his rulings, Justice McLaughlin did not have the benefit of the Court of Appeals decision in *People v LeGrand* (8 NY3d 449 [2007], *supra*), because that case was decided several years after the trial in this case. However, *LeGrand* still applies (*see People v Vasquez*, 88 NY2d 561, 573 [1996]). As stated earlier, in *LeGrand*, the Court of Appeals held that it is an abuse of discretion for the trial court to preclude expert testimony where a case turns on the accuracy of eyewitness identifications (8 NY3d at 452).

The police initially derived the *LeGrand* defendant's identity from a composite sketch based on information from five witnesses to a murder. It was not until two years after the crime that a police officer first concluded that the sketch resembled the defendant, who was under arrest for an unrelated burglary (*LeGrand*, 8 NY3d at 452-453). The five witnesses did not view a photo array or a lineup until seven years after the crime, at which time only one of them was able to identify the defendant positively from a photo array and at a lineup (*id.* at 453). Two of the remaining witnesses were shown a photo array. One witness picked out the defendant's photo as a "close, if not exact" match, while the other described the defendant's picture as "similar" to that of the assailant (*id.*). The fourth and fifth witnesses were unable to identify the defendant (*id.*).

The Court of Appeals held that the trial court abused its discretion by precluding expert testimony on eyewitness identification, particularly with respect to three factors, all of which are at issue here: (1) correlation between confidence and accuracy of identification, (2) the effect of postevent information on accuracy of identification, and (3) confidence malleability (8 NY3d at 458). The Court held that these factors were relevant to the facts and issues of that case (*id.* at 456-457), and that the defendant had established that they were generally accepted in the scientific community (*id.* at 458). The Court noted, however, that "not all categories of [eyewitness expert] testimony are applicable or relevant in every case," and that "admissibility [under *LeGrand*] would rest within the trial court's sound discretion" (*id.* at 459).

*LeGrand* followed on the heels of *People v Young* (7 NY3d 40 [2006]). In *Young*, as in this case, the assailant's face was partially covered. He entered the victims' home wielding an axe and sledgehammer and threatened to kill one of the residents who was in a wheelchair. The assailant remained in the victims' presence for five to seven minutes until the victims turned over

their cash. The assailant also stole several watches. The victims later found that other property, including binoculars and a pair of gloves, was missing from their cars. Calling the question "close" (*id.* at 42), the Court of Appeals held it was not an abuse of discretion to deny the admission of expert testimony concerning the accuracy of eyewitness identification. However, the Court noted that

> "if this case turned entirely on an uncorroborated eyewitness identification, it might well have been an abuse of discretion to deny the jury the benefit of [the expert's] opinions.
>
> "The corroborating evidence, however, significantly diminishes the importance of the proffered expert testimony in this case" (*id.* at 45-46).

That corroborating evidence consisted of the police finding the stolen property in the possession of two of defendant's female acquaintances, one of whom claimed to have received the items from the defendant.

Quite recently, in *People v Abney* (13 NY3d 251 [2009]), the Court of Appeals reinforced that *LeGrand*'s holding is not restricted to its facts. In *Abney*, the victim was mugged and a gold necklace was taken at knifepoint in a subway station. No evidence other than the victim's identification connected the defendant to the crime. Before jury selection, the defendant made a motion in limine for an expert to testify about the accuracy of eyewitness identification. The trial court denied this motion. The defendant renewed his motion, on a narrower basis, at the close of the People's case. The trial court denied this too. This Court affirmed the subsequent judgment of conviction and sentence (57 AD3d 35 [2008]). The Court of Appeals reversed, holding that, by the time the People's case closed, "it was clear that there was no evidence other than [the victim's] identification to connect defendant to the crime, and she did not describe him as possessing any unusual or distinctive features or characteristics" (13 NY3d at 268).

Here, as in *Abney* and *LeGrand*, there was no corroborating evidence and, as Justice McLaughlin noted, the case turned purely on eyewitness testimony (*see* 2 Misc 3d at 653 [identification the "only issue"]). Moreover, misidentification was a risk. None of the eyewitnesses described the perpetrator as possessing any unusual physical features, perhaps because a hood partially covered the perpetrator's face. None of the witnesses

were acquainted with defendant prior to the attack. The attack was brief and the perpetrator escaped into the subway tunnel. Therefore, *LeGrand*'s plain language requires, with regard to each category of proffered expert testimony, a trial court to determine whether that evidence would be (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror (8 NY3d at 452). Without the benefit of the *LeGrand* decision for guidance, that analysis did not occur in this case. Rather, the court believed the risk of misidentification to be low because the victim had the opportunity to observe defendant, had helped with the sketch and had picked him out of a photo array and then a lineup. The court then decided that an expert was unnecessary or that the proposed topics were within the common understanding of the jury.

With respect to several of the topics defendant proffered, the court was correct to conclude that an expert was unnecessary on the particular facts of this case. For instance, the court's analysis was probably correct with respect to how the similarity of fillers influences accuracy of identifications because the victim had previously identified defendant in a photo array and should have realized that the person she selected would be in the lineup. The same analysis would also apply to the topic of lineup instructions. Nor does defendant contest the People's arguments concerning: (1) exposure time, (2) cross-racial inaccuracy, (3) wording of investigator questions and (4) unconscious transference. Accordingly, defendant has abandoned on appeal his efforts to introduce expert testimony on these topics.

However, the court abused its discretion by not allowing expert testimony on the remaining topics. These subjects are relevant given the particular circumstances of this case. For example, Dr. Penrod was to testify about the "forgetting curve," i.e., that memory loss is greater directly after an event. While it is common knowledge that memory fades over time, it is not well known, indeed it is counterintuitive, that the greatest memory loss occurs directly after an event. This knowledge is therefore outside the ken of the average juror (*see Abney*, 13 NY3d at 259, 268). Given that the victim claimed to remember her assailant well enough to assist a police sketch artist, and the trial court's heavy reliance on the sketch to reason that an expert was unnecessary, the issue was certainly relevant. At the very least, the court should have held a *Frye* hearing to

determine whether the theory behind the "forgetting curve" is generally accepted in the scientific community.

Principles about witness confidence are already generally accepted within the scientific community (*id.* at 268). "They are also counterintuitive, which places them beyond the ken of the average juror" (*id.*). The issue of witness confidence was relevant because two of the witnesses were certain defendant was the perpetrator, while the third was nearly certain. The jury therefore deserved to hear testimony that confidence level is not necessarily related to the accuracy of the identification and that certain factors, such as trial preparation, can affect witness confidence. The existence of the sketch has nothing to do with the tenor of the witness's testimony and therefore should not have been a basis for precluding expert testimony about witness confidence. Finally, the court's alternative method of addressing the issue of witness confidence during voir dire or charging, "as it always does," that confidence does not constitute accuracy (2 Misc 3d at 655) is insufficient to dispel the risk of false identification.

Nor was the court correct to conclude that the sketch obviated the need for expert testimony. Nothing in this record supports a finding that the inaccuracies involved in eyewitness identification are ameliorated when a victim can assist a police sketch artist. Defendant never had the opportunity, despite making the request, to have his expert address this subject.

As it is undisputed that this case turned on the accuracy of eyewitness identification testimony and there was no evidence to corroborate that testimony, the court abused its discretion under *LeGrand*. Accordingly, defendant should be entitled to a new trial after a hearing on his offer of expert testimony during which the court should undertake the analysis *LeGrand* sets forth.

Nor do I consider the court's failure to conduct this hearing to be harmless. For a nonconstitutional trial error to be harmless:[3] (1) proof of guilt must be overwhelming; and (2) there must be "no significant probability that the jury would have acquitted had the proscribed evidence not been introduced" (*People v Kello*, 96 NY2d 740, 744 [2001]). As the trial court recognized, the only issue in this case was the identification of

---

**3.** Because I believe that the error was not harmless under the standard applicable to nonconstitutional trial errors, I take no position with respect to whether the Constitution requires or precludes a harmless error analysis in this case.

defendant. Yet, this case involved a real risk of misidentifications. None of the witnesses had an extended opportunity to view the assailant whose face a hood partially covered. None of them had ever seen him before. The attack was brief and the perpetrator escaped into the tunnel. No one followed him. Nothing of the victim's was found with defendant. Certainly then, the proof of defendant's guilt was not "overwhelming." Had the court permitted defendant to challenge the reliability of the identifications by means of expert testimony (proffered to include testimony relating to the "forgetting curve" and witness confidence) it is entirely possible the jury would not have believed the accuracy of the identifications. Therefore, I cannot agree with the plurality that the three eyewitnesses (victim included) were "unlikely to be mistaken," and therefore conclude that the trial court's error in excluding expert testimony was not harmless.

Despite the clear mandate from the Court of Appeals to use the *LeGrand* factors where a case turns on eyewitness testimony and there is little or no corroborating evidence, the plurality continues to interpret *LeGrand* narrowly, in an attempt to restrict its reach by corralling its facts. The plurality mentions not only the lack of forensic or other physical evidence linking the defendant in *LeGrand* to the crime, but also the seven-year interval in that case between the commission of the crime and the witness identifications. The plurality then follows a series of decisions from this Court that have distinguished *LeGrand* on the ground that the risk of misidentification was slight compared to the risk in *LeGrand* (*e.g. People v Chisolm*, 57 AD3d 223 [2008], *lv denied* 12 NY3d 782 [2009]; *People v Smith*, 57 AD3d 356 [2008], *lv denied* 12 NY3d 821 [2009]; *People v Austin*, 46 AD3d 195 [2007], *lv denied* 9 NY3d 1031 [2008]).[4]

However, in light of the Court of Appeals decision in *Abney* reversing this Court, it is now abundantly clear that we are not to restrict *LeGrand* to its facts, even if the risk of misidentification is only slight. The legal analysis is quite simple: if the case turns on eyewitness identifications and there is little or no corroborating evidence, the trial court abuses its discretion if it denies appropriate expert testimony on eyewitness identifications.

---

4. In *Chisolm* and *Smith* there was evidence beyond that of the eyewitnesses to corroborate that the defendants were the perpetrators. *Austin*, however, had no such evidence and is inconsistent with *LeGrand*.

The plurality interprets the recent Court of Appeals decision in *People v Allen*, decided with *Abney*, to mean that "corroborating evidence. . . need not be forensic or physical, but can be established by additional eyewitness testimony." However, merely because there may be more eyewitnesses than just the victim does not mean an expert is dispensable. *LeGrand* recognizes that there is now persuasive scientific evidence that, under certain circumstances, eyewitness identification testimony, even while apparently convincing and certain, is fraught with error (*see LeGrand*, 8 NY3d at 454-455; *see also State v Delgado*, 188 NJ 48, 60, 902 A2d 888, 895 [2006] ["Misidentification is widely recognized as the single greatest cause of wrongful convictions in this country"]). Without additional circumstances, such as prior familiarity with the defendant, perhaps from the neighborhood, a prior encounter with or even a more ample opportunity to observe the perpetrator, the problem of misidentification can exist whether there is one eyewitness or several. The Court of Appeals has recognized this. After all, *LeGrand* involved at least three eyewitnesses to a murder and the *LeGrand* rule speaks in terms of accuracy of eyewitness "identifications" in the plural, not singular. Therefore, *LeGrand* dictates that, without more, where a case turns on the accuracy of more than one eyewitness, an expert is still necessary. The Court of Appeals' juxtaposition of the circumstances in *Allen* with *Abney* reinforces this. In *Allen*, the Court of Appeals held the case did not turn on the accuracy of eyewitness identification because the defendant was not a stranger to either the victim or the eyewitness. *Allen* involved a robbery at a barbershop. One of the customers recognized one of the robbers, whose face was partially covered, as someone whom he encountered regularly in the neighborhood. The customer had heard the defendant's speaking voice several times during the previous six months and recognized him from both his voice and body type. The defendant also was not a stranger to one of the barbers who worked in the shop. The Court of Appeals noted that two witnesses recognized the defendant from prior encounters when it ruled that *Allen* was not a case that turned on the accuracy of eyewitness identification. Here, in sharp contrast, the perpetrator was a stranger to all involved. Nor does it make a difference that the witnesses may have noticed the perpetrator before the crime took place. That exposure was of short duration and the perpetrator's face was partially covered. The crime took place quickly and the perpetrator escaped into the subway tunnel.

Nor can I agree with Justice McGuire's analysis, despite its compelling articulation, that focuses on the single word "independently" from *Allen* to conclude that "multiple corporeal identifications that are 'independent[ ]' can cross-corroborate each other so that the case is not one in which there is but 'little or no corroborating evidence.' " *Allen* involved more than a mere independent identification. As Justice McGuire acknowledges, the Court of Appeals also took into consideration that the defendant in Allen was not a stranger to either eyewitness and had stood by and searched one of them throughout the course of the robbery. Nothing close occurred in this case. The perpetrator did not stand by or search either Rios or Alarcon throughout the course of the crime. Rather, the perpetrator's face was partially covered, the crime occurred quickly and the perpetrator escaped into the subway tunnel. More importantly, unlike in *Allen*, none of the eyewitnesses were acquainted with defendant prior to the crime. Finally, neither Rios or Alarcon identified defendant as the assailant until nearly a year after the crime occurred.

Nor do I consider the victim's interaction with the perpetrator to constitute "an extended opportunity to observe her attacker." Not only was the assailant's face partially covered, but the conversation the two had was of very short duration. Indeed, the conversation here appears not to be much longer than the conversation the victim and the perpetrator had in *Abney*, yet the Court of Appeals still held in *Abney* that it was an abuse of discretion not to allow an expert to testify. In *Abney*, like this case, the crime occurred on the subway. The assailant stopped the victim on the stairs of the subway station and asked her whether she had any change. The victim told the assailant she had no change. The two parted ways. Then, the assailant suddenly came around in front of the victim and committed the crime.

Accordingly, while I agree with Justice McGuire that it is possible to conceive of circumstances where multiple corporeal identifications can cross-corroborate each other, such as the eyewitnesses having prior acquaintance with the defendant or the defendant possessing a tattoo, scar or other distinguishing feature, this is not that case. The risk of misidentification here is too high. *LeGrand* therefore required the trial court to allow expert testimony to enhance the quality of the deliberative process as well as the reliability of its outcome.

SAXE, J.P., concurs with BUCKLEY, J.; McGUIRE, J., concurs in a separate opinion; MOSKOWITZ and ACOSTA, JJ., dissent in a separate opinion by MOSKOWITZ, J.

Judgment, Supreme Court, New York County, rendered April 28, 2004, affirmed.